

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: May 09, 2025.**

_____
**MICHAEL M. PARKER**
**UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| XIOMARA JANISSE ESCALANTE-SOSTRE, | § | CASE NO. 22-51025-MMP |
| | § | |
| DEBTOR. | § | CHAPTER 7 |
| _____ | § | |
| | § | |
| XIOMARA ESCALANTE-SOSTRE & | § | |
| ALEJANDRO SOSTRE-ODIO, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | ADVERSARY NO. 22-05101-MMP |
| | § | |
| ELOY NATALIO LOPEZ-GUTIERREZ & | § | |
| ERICKA PEREZ LOPEZ (AKA ERICKA LOPEZ), | § | |
| | § | |
| DEFENDANTS. | § | |
| | § | |
| | § | |
| | § | |
| JOSE CARLOS RODRIGUEZ-MARTINEZ, | § | |
| ARNULFO DE LA CRUZ, MIGUEL ANGEL | § | |

1

**PADILLA PEREZ, LUIS F. HERNANDEZ,** §
**ARTURO VALLADOLID RODRIGUEZ, FELIZ** §
**FERNANDO AUCES, VICTOR SANCHEZ, MARIA** §
**E. AGUILERA-RIOS, PEDRO MAURICIO** §
**VALDEZ-GONZALEZ, ISMAEL CASTILLEGO** §
**GRAJALES, JORGE LUIS SALAZAR-BRAVO, J.** §
**GUADALUPE GALVAN TORRES, FELIX HIRAM** §
**AUCES OVALLE, MARCELINO J. GARZA, JUAN** §
**ROMAN GONZALEZ DUQUE, EDUARDO** §
**ESEQUIEL LIMON REYES, FELIPE DE JESUS** §
**CARRILLO, LUIS ALONSO AGUILAR, RICARDO** §
**ALBERTO LONGORIA, JAHIRO ESMELY** §
**RODRIGUEZ PEREZ, OSCAR DANIEL FRANCO** §
**VACA,** §
§
      **INTERVENORS,** §
§
_____ §
§
§
**AGUSTIN CHIAPAZ ALVAREZ,** §
§
      **INTERVENOR,** §
§
**V.** §
§
**MARKES E. KIRKWOOD,** §
§
    **THIRD PARTY DEFENDANT.** §

_____

2

OPINION

## I.     INTRODUCTION

The Court simultaneously tried several adversary proceedings related to a civil action filed in the 166th Judicial District Court of Bexar County, Texas, which was removed to this Court. ECF No. 1.[1] Among myriad claims and counter-claims that arose both while the action was in state court and after removal, this Court tried a series of claims made by Debtor, Xiomara Janisse Escalante-Sostre ("**Escalante-Sostre**") and her non-filing spouse Alejandro Sostre-Odio ("**Sostre-Odio**") against Defendants Eloy Natalio Lopez-Gutierrez ("**Gutierrez**"), Ericka Perez Lopez ("**Lopez**") and the Intervenors. After a trial on the merits, the Court finds Defendants' statements to be defamatory and awards relief accordingly.

## II.     JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, and the Standing Order of Reference of the United States District Court for the Western District of Texas, dated October 4, 2013. Venue is proper under 28 U.S.C. § 1409. This is a non-core proceeding, but Plaintiffs, Defendants, and the Intervenors have consented to the entry of final orders and a judgment by this Court. ECF No. 64.

## III.     BACKGROUND

Plaintiff Escalante-Sostre solely practiced as an immigration lawyer in San Antonio from 2012 to 2020. She represented numerous clients before immigration courts and the United States Citizenship and Immigration Service ("**USCIS**"). Escalante-Sostre and her spouse Sostre-Odio originally brought an adversary proceeding in state court against Gutierrez and Lopez seeking

---

[1] "ECF" denotes the electronic filing number.

damages for defamation and business disparagement, as well as a temporary restraining order enjoining Gutierrez and Lopez's defamatory speech.[2] Gutierrez and his spouse Lopez (collectively "**Defendants**") responded with counterclaims raising various tort and contract claims against Escalante-Sostre related to services Defendants claim she failed to provide or provided defectively. Other former Escalante-Sostre clients ("**Intervenors**") intervened on Lopez and Gutierrez's side of the docket making similar claims.[3] The Court previously ruled on that portion of the dispute (dischargeability claims) in a four-hour oral ruling.[4]

Although Intervenors and Sostre-Odio joined the fight, the trial made clear that all the claims, counterclaims and cross claims predominately revolved around a dispute between Plaintiff Escalante-Sostre and Defendants Gutierrez and Lopez. Thus, the Court will briefly detail the background of Escalante-Sostre's representation of Gutierrez and the ensuing events.

In February 2019, Defendants contracted with Escalante-Sostre for legal services. Gutierrez entered the country without authorization in 2005 and remained undocumented at the time of contracting. The contract between the parties provided that the services were to include "consular process and court." Def.'s Ex. 1. This meant that Escalante-Sostre would help Gutierrez institute consular processing abroad (a necessary step in his goal of becoming a legal permanent

---

[2] Application for Temporary Restraining Order and Original Petition for Temporary and Permanent Injunction, *Xiomara Escalante-Sostre et al v. Eloy N. L. Gutierrez et al*, Case No. 2020-CI-03996 (filed Feb. 27, 2020). The Court also previously dissolved one injunction and upheld another in this case. ECF No. 47.

[3] Counterplaintiff's Original Counter-Petition and Intervenor's Original Petition for Intervention, *Xiomara Escalante-Sostre et al v. Eloy N. L. Gutierrez et al*, Case No. 2020-CI-03996 (filed July 31, 2020).

[4] Gutierrez's claims for non-dischargeability were litigated under Adv. Proc. No. 23-05073. On February 4, 2025, the Court orally ruled on all of the Defendants' and Intervenors' dischargeability proceedings (at least, those that reached trial), which were litigated under Adv. Proc. Nos. 23-05048, 23-05049, 23-05050, 23-05051, 23-05052, 23-05053, 23-05054, 23-05055, 23-05056, 23-05057, 23-05058, 23-05059, 23-05060, 23-05061, 23-05062, 23-05063, 23-05064, 23-05065, 23-05066, 23-05067, 23-05068, 23-05069, 23-05070, 23-05071, 23-05072, and 23-05073. The initial complaints in each of these proceedings sought multiple forms of relief, but the Court dismissed all relief other than the dischargeability causes of actions in a series of determinations on several motions to dismiss. The Court also orally ruled on a related third-party complaint brought by third party plaintiff and Intervenor Augustin Alvarez against third party defendant, counsel Markes Kirkwood. The Court issued its oral ruling at a hearing held on February 4, 2025.

4

resident) and would also defend him in his pending removal proceedings. In exchange, Defendants paid Escalante-Sostre $3,500. Although Gutierrez was the named client in the contract, Lopez was authorized as his representative and appears to have initially been the primary client decision-maker in the representation of Gutierrez.

At the time of contracting, Gutierrez already had an approved I-130 Petition for Alien Relative on file with USCIS. He testified that at the initial meeting with Escalante-Sostre, Gutierrez and Lopez wished to pursue an EOIR 42B Cancellation of Removal ("**42B**") in his removal case. Escalante-Sostre, on the other hand, testified that while they discussed the 42B at the initial meeting, the parties also discussed Gutierrez's desire to work and how filing an asylum application could allow him to obtain work authorization. According to Escalante-Sostre, Gutierrez did not have (and needed to obtain) authorization to work legally, so the asylum application was a necessary step in getting work authorization.[5] At trial, Defendants testified that an asylum application was never discussed.

After contracting, Escalante-Sostre began work on Gutierrez's I-589 Application for Asylum and for Withholding of Removal and then "lodged but did not file"[6] the application in June 2019. Pl.'s Ex. 17. Escalante-Sostre also filed a G-28 Notice of Appearance disclosing her representation of Gutierrez. Pl.'s Ex. 14. After lodging the I-589, Escalante-Sostre finally received Gutierrez's client file from Defendants' previous attorney, Michael Morgan. The file contained information that she alleges Defendants did not disclose to her in their initial intake meeting. The

---

[5] Most undocumented immigrants are not automatically granted authorization to work in the United States, and employers seeking to comply with employment law will not hire immigrants who lack work authorization. Asylum-seekers, however, may obtain work authorization after lodging an asylum application and waiting for 180 days.

[6] According to Escalante-Sostre's uncontroverted expert witness Teresa Coles-Davila: "lodging but not filing" asylum applications is a common strategy employed by immigration attorneys to obtain work authorization for their clients while waiting for immigration determinations to be made. Pl.'s Ex. 60.

file showed that Defendants had hired two previous immigration attorneys, and that Morgan had terminated his representation of Defendants for lack of responsiveness and for failure to pay filing fees. Lopez testified that Defendants paid Morgan $5,000 in attorney fees, and that he did "nothing" for them.

More importantly, Escalante-Sostre discovered that Gutierrez had been arrested for felony assault of a child, and that he had received the equivalent of a conviction for that offense, from the perspective of immigration law.[7] She also discovered that Gutierrez had later been arrested (but not convicted) for misdemeanor assault of a family member.

These revelations made Gutierrez's immigration case much more difficult. These revelations put Defendants' stated goal (a 42B) out of reach—42B applications are adjudicated with a very stringent standard and the relief granted is discretionary and rare.[8] Based on that standard, Escalante-Sostre reasonably understood that 42B relief was very unlikely and she would need to pursue other legal avenues for Gutierrez.

Undeterred, Escalante-Sostre continued the representation, resetting a biometric capture appointment for Gutierrez from September 2019 to December 2019. In November, Lopez confronted Escalante-Sostre at her office, accusing Escalante-Sostre of "doing nothing on the case" and belligerently demanding Gutierrez's file. Corroborated and unrebutted testimony showed that Lopez arrived without an appointment, scared Escalante-Sostre's staff, and refused to leave

---

[7] Gutierrez received a "deferred adjudication" for the felony assault of a child, which required Gutierrez to either plead guilty or no contest. Immigration law treats this type of disposition of a criminal case as a "conviction." 8 U.S.C. § 1101(a)(48)(A); *Moosa v. INS*, 171 F.3d 994, 1005–06 (5th Cir. 1999) (concluding that a Texas deferred adjudication qualified as a "conviction" under § 1101(a)(48)(A)).

[8] To receive relief via a 42B, the alien must establish that removal would impose "exceptional and extremely unusual hardship" (a standard which does not view mere family separation as sufficient), as well as a showing of (among other things): (1) good moral character for the past ten years and (2) no convictions of certain "crimes of moral turpitude" as defined in statute and case law. 8 U.S.C. § 1229b(b)(1).

6

Escalante-Sostre's office unless Escalante-Sostre met with her and complied with her demand for a full refund of amounts paid. Lopez testified that she wanted a refund so Defendants could hire a different attorney.

After Escalante-Sostre met with Lopez but refused her full refund request, Lopez persisted and refused to leave Escalante-Sostre's office without a full refund. Lopez remained until Escalante-Sostre threatened to call the police, at which point Lopez departed without her demanded full refund. Escalante-Sostre later met with Gutierrez and threatened to terminate the representation unless Gutierrez de-authorized Erika Lopez from access to his case. Gutierrez testified that he agreed to this de-authorization because he soon had an immigration hearing at which he needed Escalante-Sostre's assistance, so he needed her immediate continued representation. Pl.'s Ex. 2.

Then, Escalante-Sostre made a mistake. Gutierrez had a hearing in his removal case set for December 5, 2019, and when the case was called, Escalante-Sostre failed to appear on his behalf. Fortunately, as established via a recording introduced into evidence, this did not immediately impact Gutierrez's immigration case. The immigration judge simply telephoned Escalante-Sostre, and rather than wait for her to arrive in court as she committed to, he simply continued the proceedings to March 2020. *See also* Pl.'s Ex. 23. Incensed at the mistake, Gutierrez and Lopez promptly fired Escalante-Sostre. Escalante-Sostre would not again appear in Gutierrez's immigration case.

Lopez testified that after the firing, she filed suit against Escalante-Sostre in small claims court, accusing Escalante-Sostre of fraud and theft, and seeking a full refund of the retainer paid

7

to Escalante-Sostre. Pl.'s Ex. 3. She also testified that she first met with her new immigration attorney, Lorenzo Tijerina, in December 2019.

On January 6, 2020, Lopez created a Facebook page entitled "XIOMARA ESCALANTE FRAUD" ("**Facebook Page**"). According to Lopez, she created the Facebook Page to "let people know the things that Ms. Escalante was doing to other people, in their immigration process, and that they needed to speak out and not be afraid." The page included a picture of Escalante-Sostre from the Escalante-Sostre Law Office ("**Law Office**") Facebook page and a picture of Escalante-Sostre's family, including her husband and children. Lopez testified that this was "fair game" because Escalante-Sostre had linked her Law Office business page to her personal Facebook page.

After creating the Facebook Page, Lopez shared links to the page on multiple other Facebook pages frequented by Spanish speakers in San Antonio.[9] In these distributive posts, she included statements which the Plaintiffs argue are defamatory, including:

> "This page is for the people that Xiomara Escalante has done wrong to their immigration case and has robbed your money. Please tell your story."

> "Go to this page if this lawyer did fraud to you or your family members. I want to help you. And plus start a law suit for her stealing your money."

> "I myself am suing her for the same because she is robbing money from people she is not doing anything in the cases."

> "Don't believe anything this lady [Escalante-Sostre] says. She is doing this because she needs more clients to continue with her bad things and robbing from people."

> "This woman who is robbing a lot of people."

> "Don't be afraid because this lady [Escalante-Sostre] must face justice for all those she has robbed their money."

> "Today I saw an 18 year old girl that is graduating in her high school class number #6, but it's a shame that her father cannot be present to see his daughter graduate from her school

---

[9] These included "LA PULGA HISPANA" and "El Mercadito San Antonio."

with good grades and also seeing the universities that are offering scholarships to her. It is Xiomara's fault that this man was deported because of bad practices of Xiomara. This man doesn't have criminals, nor tickets against him only that Xiomara never appealed the case of the man and was never aware of the things she was doing. Very soon we will have our court with her and show that many things are fraud."

Intervenor Oscar Franco Vaca also posted a message in response to an unknown person who was asking for further information:

"Sue her old man…she's committing fraud the Marshals will notify her she is not registered to practice."

On January 10, 2020, Lopez coordinated with other clients who reached out to her after seeing the Facebook Page to go to Escalante-Sostre's office and stage a protest to demand their money back. Lopez also contacted the media, and Univision sent a reporter and a camera operator to report on the conflict. Lopez testified that she contacted the media to spread awareness of Escalante-Sostre's alleged fraud so that other clients would bring claims against Escalante-Sostre. She also testified that the reason for starting the campaign was that she "just wanted her money back." Univision ran a story that same evening describing the confrontation at Escalante-Sostre's offices, detailing the clients' accusations that Escalante-Sostre did nothing in their cases despite them paying, and stating that the clients' cases were left "in limbo" by Escalante-Sostre's failure to do things in their cases.

That same day, Lopez filed a police report at the Castle Hills Police Department, accusing Escalante-Sostre of theft and alleging that Escalante-Sostre stole $3,500 from her. Pl.'s Ex. 51. Neyda Sandoval (wife of Intervenor Jorge Salazar Bravo), Intervenor Maria Aguilera-Rios, and a Ronald Ramirez joined the police complaint with their own assertions of theft. Lopez also reached out to associates of Escalante-Sostre and her family, including sending a message over social media to the director of Miss Texas Petite (a beauty pageant that Escalante-Sostre's daughter was

9

participating in) warning the director of the lawsuit and accusing Escalante-Sostre of fraud. Pl.'s Ex. 9.

Escalante-Sostre then began these legal proceedings against the Defendants in the 166th District Court of Bexar County, Texas. The initial complaint sought a temporary restraining order enjoining the harassment by Lopez, a declaratory judgment for breach of contract, and relief related to the defamation, including damages and a permanent injunction. The litigation continued in state court, with the Defendants joining the Intervenors to the lawsuit and counterclaiming for breach of contract and fraud. Escalante-Sostre testified that the Law Office stopped taking new clients in 2020 and any remaining work that was done by the Law Office was to complete existing cases.

Over the course of the litigation, Lopez sent a message to the political campaign of Marc LaHood, trying to create a political story by saying that Misty Spears (who was running for district clerk) was representing Escalante-Sostre, "an immigration attorney who she lied and did not comply with their cases." Pl.'s Ex. 4 at 58 [sic]. Misty Spears was not representing Escalante-Sostre, but her husband, Adrian Spears, was. Lopez also organized multiple other Univision news stories to publicize her and the Intervenors' efforts against Escalante-Sostre.

In September 2022, Escalante-Sostre and the Law Office each filed for chapter 7 bankruptcy. Case Nos. 22-51025-mmp (In re Xiomara Janisse Escalante-Sostre), 22-51023-mmp (In re Law Office of Xiomara Escalante-Sostre, PLLC). In the Law Office's chapter 7 case, the Trustee abandoned any causes of action back to the Debtor, including this action. Case No. 22-51023-mmp, ECF No. 31. The Law Office's bankruptcy case closed with no distribution, and the Law Office was shut down.

Escalante-Sostre removed the state court action to this Court in her personal bankruptcy case. In her personal case, Escalante-Sostre received a full discharge. The Defendants and many of the Intervenors filed non-dischargeability complaints under § 523(a)(4), which were heard by this Court along with the instant defamation action.[10] These dischargeability actions largely replaced the counterclaims raised in this action, as virtually all of the counterclaims raised by Defendants and Intervenors in the state court proceedings would have been discharged by the bankruptcy.

All of the non-dischargeability complaints ended with a result in Escalante-Sostre's favor—the complaints were either dismissed before trial or the underlying debts were held to be dischargeable by this Court in its oral ruling on February 4, 2025. Prescient to this case, Eloy Lopez-Gutierrez sought to have his claim against Escalante-Sostre for "fraud while acting in a fiduciary capacity" declared non-dischargeable.[11] In this Court's oral ruling on his dischargeability complaint, the Court held not only that Gutierrez failed to prove the elements of § 524(a)(4), but also found that Gutierrez failed to prove that: (1) Escalante-Sostre had committed *any* fraud against him, and (2) he held an actionable debt against Escalante-Sostre.

## IV.   DISCUSSION

Plaintiffs raise multiple claims against Defendants. Both Plaintiffs seek damages for defamation and civil conspiracy, and Escalante-Sostre also brings a business disparagement claim on behalf of the Law Office.[12] Finally, Plaintiffs seek to permanently enjoin the Defendants from intimidating, bullying, or harassing the Plaintiffs, the Plaintiffs' children, and Plaintiffs'

---

[10] *Supra* note 4.

[11] Eloy Lopez-Gutierrez's dischargeability proceeding was litigated under Adv. Proc. 23-05073.

[12] With the Trustee's abandonment of all assets back to the Debtor, including any causes of action raised in this case, along with the dissolution of the Law Office, these claims reverted to Escalante-Sostre personally.

"associates, employees, contractors, and/or third parties." Both Plaintiffs also ask that the permanent injunction require that Defendants remove any prior defamatory statements from publication and to actively report to any media source with which Defendants have previously dealt that their previous statements had been found to be defamatory.

### A. Defamation

Plaintiffs' first claim is for libel, levied against Defendants and Intervenors. Despite pleadings suggesting defamation claims against all Intervenors, Plaintiffs' post-trial briefing directs the Court to allegedly defamatory statements made by Defendants Lopez and Gutierrez, by Intervenors Oscar Daniel Franco Vaca and Maria Aguilera-Rios, and by two parties not joined to this action, Pearl Auces and Neyda Sandoval.

Libel, the written form of defamation, is defined by Texas statute as "a defamation expressed in written or other graphic form that…tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury." TEX. CIV. PRAC. & REM. CODE § 73.001. To succeed in an action for libel, a plaintiff must prove that the defendant (1) published a written statement, (2) that was defamatory, (3) while acting with either actual malice (if the plaintiff was a public official or public figure) or negligence (if the plaintiff was a private individual) regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

To begin, the Court finds that Plaintiff Sostre-Odio failed to point to any defamatory statements which could give rise to a claim. Although Sostre-Odio repeatedly referenced his

12

inclusion in the photo that was put on the Facebook Page, the Court does not believe the collateral inclusion of Sostre-Odio's photo on the Facebook Page with "fraud" in the title constitutes an actionable defamatory statement against Sostre-Odio. The context of the photo and the clear focus of the Facebook Page was to assert the "fraud" Escalante-Sostre was alleged to have perpetrated. No specific allegations against Sostre-Odio were ever articulated. Therefore, the Court will not award damages in Sostre-Odio's favor for defamation. As to his claims for civil conspiracy and a permanent injunction, the Court will similarly deny those claims to the same extent and for the same reasons the Court denies them as to Escalante-Sostre, detailed below.

The Court will dismiss the defamation claim against Pearl Auces.[13] The record both in this Court as well as in state court do not show that Pearl Auces was ever joined to this action as an Intervenor. Although she testified at trial, she testified on behalf of Intervenors Feliz Fernando Auces and Felix Hiram Auces (her husband and son, respectively). Plaintiffs fail to explain how this Court can afford them relief against a party who was never joined to the action and who presumably never received notice of the claims against her personally. But even had Auces been properly joined, the Court struggled to find the identified defamatory statements in the record from Auces. There is one social media post from Auces which states: "This lady has just had us going for 3 years on a loop no one never answer and she called me 2 ½ weeks and she just said I'll call u back on Friday cuz we're moving and I've never heard anything." Pl.'s Ex. 4 [sic]. The Court finds that this statement does not rise to the level of defamation per se because it is not so "obviously hurtful to a plaintiff's reputation that a jury may presume general damages." ***Hancock v. Variyam***, 400 S.W.3d 59, 63–64 (Tex. 2013). Because the action would therefore be for

---

[13] Feliz Fernando Auces Ovalle is an intervenor, but his wife Pearl Auces is not.

defamation per quod[14] as opposed to per se, actual damages must be shown. ***Brady v. Klentzman***, 515 S.W.3d 878, 886 (Tex. 2017) ("Absent evidence of actual damages in a case of defamation *per quod* judgment should be rendered for the defendant."). The Plaintiffs provided insufficient evidence of actual damages that resulted from Pearl Auces' statement specifically. Moreover, the Court finds that some aspects of the statement were proven to be true on the record—Escalante-Sostre was, at times, slow to respond to her clients. Therefore, the Court will dismiss the claim of defamation against Auces.

The Court will also dismiss defamation claims against Nevda Sandoval and Intervenor Aguilera-Rios. Similar to Auces above, the Court is concerned that Sandoval was never properly joined to this action as an Intervenor, and although she also testified at trial, she testified on behalf of her husband, Intervenor Jorge Luis Salazar Bravo. Sandoval did not appear in the caption of the pleadings, and also likely did not receive notice of claims against her individually. Therefore, the Court will dismiss the defamation claim against Sandoval.

Plaintiffs have argued that the basis for their defamation claim against Aguilera-Rios was simply the police report filed at Castle Hills Police Department which accused Escalante-Sostre of theft. The incident report details that Aguilera-Rios accused Escalante-Sostre of doing "nothing" in her immigration case, and that she sought to press charges against Escalante-Sostre for theft. Pl.'s Ex. 51.

---

[14] Defamation per quod means a statement that is not on its face slanderous but only appears slanderous and still needs to be proved slanderous to be actionable. *Libelous Per Quod*, BLACK'S LAW DICTIONARY (2d. ed) (last visited April 28, 2025), available at: https://thelawdictionary.org/?s=per+quod.

A "qualified privilege" from defamation liability attaches to statements made to police about the possible commission of a crime.[15] ***Pease v. Bembry***, No. 03-02-00640-CV, 2004 Tex. App. LEXIS 6257 at *8 (Tex. App.—Austin July 15, 2004) ("One such occasion giving rise to the qualified privilege occurs when a person makes a statement to police identifying someone as a potential suspect in the commission of a criminal offense."). Qualified privilege is a middle ground between absolute immunity and no privilege, in that it "cast[s] upon the plaintiff the burden of proving that malice prompted the act—not merely malice which arises by implication of law, but malice in fact, otherwise denominated actual malice." ***Cranfill v. Hayden***, 80 S.W. 609, 613 (Tex. 1904); *see also* ***Randall's Food Mkts. v. Johnson***, 891 S.W.2d 640, 646 (Tex. 1995) (holding that a qualified privilege attached to communications made in the course of an investigation following a report of employee wrongdoing, and that proof of actual malice "defeats the privilege.").

It is true that a party must raise qualified privilege as an affirmative defense at trial, but a defendant only bears the burden of proving privileged publication if the plaintiff's petition fails to affirmatively demonstrate the privilege. ***Burbage v. Burbage***, 447 S.W.3d 249, 254 (Tex. 2014) (citing ***Denton Pub. Co. v. Boyd***, 460 S.W.2d 881, 884 (Tex. 1970)). Here, the Court finds that the privilege both appears on the face of Plaintiffs' petition, and the Defendants and Intervenors adequately (if obliquely and without citing authority) claimed privilege for filing police reports. Further, Plaintiffs failed to show at trial that Intervenor Aguilera-Rios acted with actual malice

---

[15] The Court does not condone the filing of false police reports, but such reports are privileged against civil defamation liability. Evidence presented suggested that the police reports filed by Lopez, Sandoval and Aguilera-Rios with the Castle Hills Police Department were false, which may itself have been a criminal act. TEX. PENAL CODE § 37.08. Lopez, Sandoval and Aguilera-Rios attempted to use a false report of theft to the police to create leverage against Escalante-Sostre in their battle to obtain a complete refund of the monies they paid to Escalante-Sostre to represent them. When they became unsatisfied with the representation, they accused her of fraud and filed police reports. Evidence presented also suggested they filed police reports to further their pursuit of U-Visa applications.

15

when filing the police report. Therefore, the Court will dismiss the defamation claim against Intervenor Aguilera-Rios.

The Court will now consider the remaining defamation claims against Defendants Lopez and Gutierrez, as well as against Intervenor Vaca.

   (i)     *Defendants and Intervenor Vaca published a statement.*

Lopez published many statements about Escalante-Sostre and her dissatisfaction with the legal services that her husband received. Lopez created the Facebook Page, the substance and title of which accused Escalante-Sostre of fraud. Over time, Lopez published multiple statements both on the Facebook Page and on other pages which described her dissatisfaction with Escalante-Sostre and accused her of fraud and theft. It is undisputed that Lopez published these statements about Escalante-Sostre.

As stated above, Lopez was the primary driver of Defendant Gutierrez's immigration case and generally of his legal dealings with others. The only statement which could be considered defamatory that came from Gutierrez himself was stated on one of the Univision programs, where Gutierrez asserted that Escalante-Sostre "did nothing" on his case.

Intervenor Vaca made one published statement included in evidence, a comment on a post on the Facebook Page which urged an unknown poster to sue Escalante-Sostre because she was "committing fraud," and stating that Escalante-Sostre was "not registered to practice."

   (ii)    *Defendants' and Vaca's published statements were defamatory per se.*

The Court finds that many statements published by Lopez were defamatory per se. As stated above, a statement is defamatory if "the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury." ***Einhorn v. LaChance***,

16

823 S.W.2d 405, 410-11 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). Statements are defamatory per se when they are "so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish. A statement that injures a person in her office, profession, or occupation is typically classified as defamatory per se." *Hancock*, 400 S.W.3d at 63–64. Some courts have also included in this category statements which impute the commission of a crime. *Gray v. HEB Food Store No. 4*, 941 S.W.2d 327, 329 (Tex. App.—Corpus Christi 1997, writ denied).

Many of Lopez's statements squarely fall under the definition of defamation per se. Lopez repeatedly accused Escalante-Sostre of "stealing money from her clients" and "robbing people." She frequently claimed that Escalante-Sostre had committed fraud (including in the title of the Facebook Page) and said that she was exposing "all of the bad things" that Escalante-Sostre was doing as an immigration attorney. Unlike *Hancock v. Variyam*, where the Texas Supreme Court held that statements attacking a physician's honesty did not qualify as defamation per se because the statements did not injure the physician in his occupation, Lopez's statements directly attack Escalante-Sostre's dealings with her clients as an attorney and accuse her of fraud while acting as their attorney. The Court therefore finds that Lopez's statements were defamatory per se.

The Court also finds that Gutierrez's statement was defamatory per se. Gutierrez's statement to Univision that Escalante-Sostre did "nothing" in his case was both untrue and attacked Escalante-Sostre in her profession, implying that she was not doing the job she was hired to do. Gutierrez's statement was therefore defamatory per se.

17

The Court similarly finds that Intervenor Oscar Franco Vaca's statements that Escalante-Sostre is "committing fraud" and was "not licensed to practice" are defamatory per se because they injure Escalante-Sostre in her profession.

*(iii)  Escalante-Sostre was not a "public figure" and therefore the standard for defamation is negligence.*

The Supreme Court has frequently wrestled with the tension between defamation and the First Amendment. Through its cases on the subject, the Court has sought to strike a balance between the states' interest in providing remedies for statements which falsely tarnish one's reputation and the federal interest in protecting speech. As to the states' interest, the remedies for defamation "reflect no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments…" ***Rosenblatt v. Baer***, 383 U.S. 75, 92 (1966) (concurring opinion). The First Amendment, on the other hand, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." ***New York Times Co. v. Sullivan***, 376 U.S. 254, 269 (1964).

Pursuant to this federal interest, in ***New York Times***, the Court imposed a higher standard of culpability that defamation plaintiffs must prove to recover. This higher standard was termed "actual malice," which requires that where the defamation plaintiff is a "public official" or "public figure," the plaintiff must show that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." ***Id.*** at 280. Later opinions by both the Supreme Court and lower courts would delineate public figures into "all-purpose public figures" and "limited-purpose public figures." ***Gertz v. Welch***, 418 U.S. 323, 345 (1974). Whether

18

or not a plaintiff is a "public figure" is a matter of law to be decided by the court. *WFAA-TV*, 978 S.W.2d at 571.

Both parties agree that Escalante-Sostre was not an "all-purpose public figure," but disagree as to whether she was a "limited-purpose public figure." The Fifth Circuit has promulgated a three-part test to determine whether a plaintiff is a "limited-purpose public figure":

(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

(2) the plaintiff must have more than a trivial or tangential role in the controversy; and

(3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Trotter v. Jack Anderson Enters.*, 818 F.2d 431, 433 (5th Cir. 1987).

The definition and scope of the controversy at issue is a pivotal step in the "limited-purpose public figure" analysis. A court must "examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *WFAA-TV*, 978 S.W.2d at 572 (quoting *Waldbaum v. Fairchild Publications*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)).

In *WFAA-TV*, the plaintiff McLemore was a local journalist reporting on the failed ATF raid of the Waco Branch Davidian compound in 1993. McLemore sued multiple media defendants for suggesting that he tipped off those inside the compound ahead of the raid in exchange for media access. In examining whether McLemore was a "limited-purpose public figure," the Texas Court

19

of Appeals for the Tenth District in Waco defined the "controversy" at issue narrowly, limiting it to "McLemore's personal ethical standards as a journalist." But the Texas Supreme Court reversed, instead defining the "controversy" as the broader question of "why the ATF agents failed to accomplish their mission." 978 S.W.2d at 572.

In this case, there was no such "public controversy" that Escalante-Sostre was taking part in. Escalante-Sostre was a private citizen conducting business and providing legal services who became involved in what amounts to a fee dispute or a malpractice accusation. Rather than first pursuing judicial or disciplinary remedies against Escalante-Sostre, the Defendants took their case to the court of public opinion and published defamatory statements to pressure Escalante-Sostre into refunding fees paid.

Defendants argue that the "controversy" here should be defined as "Escalante-Sostre's provision of fraudulent immigration services." Even if the Court agreed a private controversy existed regarding Escalante-Sostre's services preceding the defamation, Defendants submitted no evidence showing that it was a "public controversy" when the defamatory statements were made. The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. *Time, Inc. v. Firestone*, 424 U.S. 448, 454-55 (1976).

It is true that there has been media coverage of this case, even before it was filed. Lopez, after creating the Facebook Page and making some of the defamatory statements, contacted Univision to join her at a protest at Escalante-Sostre's office. Univision has since run multiple stories related to this case. But inviting the media into what is essentially a private dispute between Defendants and Escalante-Sostre does not transform Escalante-Sostre from a private figure to a

limited-purpose public figure. Escalante-Sostre took no action to thrust herself into a particular public controversy but was instead unwillingly dragged into the public eye by Lopez's defamatory statements and by Lopez's recruitment of Univision to publicly broadcast her private complaints. Lopez is precluded from claiming that Escalante-Sostre is a limited-purpose public figure when she herself was the one who attempted to make the controversy public. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."); *Neely v. Wilson*, 418 S.W.3d 52, 71 (Tex. 2013) ("In other words, the allegedly defamatory statement cannot be what brought the plaintiff into the public sphere; otherwise, there would be no private figures defamed by media defendants.").

Defendants direct this Court to Escalante-Sostre's local advertising efforts as evidence of her position as a "limited-purpose public figure." Defendants argue that "if a party voluntarily engages in activities such as advertising their services to the public, that party must recognize it is subject to increased scrutiny, and accept a risk of increased exposure and injury to its reputation." In other words, Defendants argue that any person who advertises becomes a "limited-purpose public figure" for any defamation disputes related to their services, triggering the *New York Times* "actual malice" standard. The Court declines at this time to adopt such an expansive view of the "actual malice" doctrine.

To begin, focusing on a defamation plaintiff's own advertising ignores the *Trotter* standard which limits the inquiry to a "public controversy" that is both ascertainable and inherently limited in scope. *National Rifle Assoc. of Am. v. Ackerman McQueen, Inc.*, Case No. 19-CV-2074, 2021 WL 3618113, at *13 (N.D. Tex. Aug. 16, 2021). But further, expanding "actual malice" to

21

any party who has engaged in advertising does not align with the reasons the Supreme Court laid down for creating the standard in *New York Times* and its progeny. The First Amendment was "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times*, 376 U.S. at 269. "In contrast, speech on matters of purely private concern is of less First Amendment concern...the role of the Constitution in regulating state libel law is far more limited when the concerns that activated *New York Times* and *Gertz* are absent." ***Dun & Bradstreet v. Greenmoss Builders***, 472 U.S. 749, 759 (1985). Such private speech receives less stringent constitutional protections, and the state interest in awarding presumed and punitive damages is "substantial" relative to the "incidental effect these remedies may have on speech of significantly less constitutional interest." ***Id.*** at 760.

Viewing Escalante-Sostre as a private plaintiff also aligns with some reasons given in ***New York Times*** and its progeny for raising the standard of proof in defamation cases involving public figures. In many of the Supreme Court's cases on the subject of "actual malice," the Court reasoned that the standard of proof could be raised because public figures have greater access to the media and therefore have an increased ability to "set the record straight." *See, e.g.*, ***Gertz***, 418 U.S. at 344 ("Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."). In this case, none of that reasoning applies. Not only did Escalante-Sostre lack ready access to the media, but her ethical obligations to keep client information confidential *prevented* her from access to the media to influence public opinion. Faced with the defamatory statements made both on social media and on the news, Escalante-Sostre could not ethically respond to the accusations with her side of the story without risking

22

disciplinary action. Because of this, many of the circumstances animating the Supreme Court's opinions on "actual malice" do not exist here. Escalante-Sostre is not a "limited-purpose" public figure, and therefore the Court will apply a negligence standard to this defamation action.

> (iv)  *Defendants and Intervenor Vaca were negligent in making the defamatory statements.*

Because Escalante-Sostre is a private plaintiff, she must prove that the Defendants and Intervenor Vaca acted with negligence. ***Hancock***, 400 S.W.3d at 63–64 (citing ***Foster v. Laredo Newspapers, Inc.***, 541 S.W.2d 809, 820 (Tex. 1976)). "After ***Gertz*** and ***Dun & Bradstreet***, there must still be a showing of fault in a defamation per se claim between private parties over a matter of private concern." ***Hancock***, 400 S.W.3d at 63–64 (citing Restatement (Second) Of Torts § 580B (1977)).

In a defamation case, negligence is defined as "the failure to investigate the truth or falsity of a statement before publication, and the failure to act as a reasonably prudent person." ***Day v. Fed'n of State Med. Bds. of the United States, Inc.***, 579 S.W.3d 810, 822 (Tex. App.—San Antonio 2019, pet. filed); ***Terrell v. Mazaheri***, 676 S.W.3d 116, 129 (Tex. App.—San Antonio 2023, no pet.). In other words, the question is whether the Defendants and Intervenor Vaca knew or should have known that their defamatory statements were false, and whether they acted reasonably.

The Court finds that Lopez acted negligently in making the defamatory statements. Taken in the best light, Lopez should have known the statements she made were false, and she acted unreasonably. Lopez's actions were both in response to disagreement with her husband's attorney and in frustration with the results the immigration system had to offer. At best, Lopez failed to act reasonably in response to this adversity. Rather than communicate reasonably with Escalante-

Sostre to address the issues in the relationship, seek alternative counsel, or pursue legal remedies for alleged malpractice, Lopez decided the best course of action was to publicly defame Escalante-Sostre online to her clients, family, and to the public generally, as well as to discredit her practice. Moreover, Lopez intentionally ratcheted-up the pressure on Escalante-Sostre by inviting Univision to her protests and by filing a privileged police report.

Lopez made false, inflammatory statements that she knew could cause other clients of Escalante-Sostre to question the services they had received. At the very least, even if Lopez's statements contained some truth (and they don't), the Court would still not be able to condone this form of vigilante justice. In short, it was unreasonable and negligent conduct.

But there is further circumstantial evidence that suggests Lopez *knew* that what she was saying was false and said it anyway. As the Court stated in its oral ruling on Eloy Lopez-Gutierrez's dischargeability case against Escalante-Sostre, the availability of a U-Visa for victims of crimes in the United States looms large over the circumstances of this case. U-Visas can be awarded to victims of certain "qualifying crimes" committed in the United States. Unlike many other forms of relief, the U-Visa (and its accompanying waivers) can be used to overcome more serious immigration violations than other forms of relief, making it desirable for immigrants who do not have many other options to legalize their status. During testimony, Lopez stated that her dischargeability case against Escalante-Sostre for fraud while acting in a fiduciary capacity was intended to help secure her husband immigration relief via the U-Visa.

The evidence also showed that this was not the Defendants' first interaction with immigration attorneys. The Defendants had hired two other immigration attorneys before hiring Escalante-Sostre, including Michael Morgan. Lopez testified that they paid Morgan $5,000 and he

24

did "nothing" in their case. When asked why she didn't file suit against Morgan as she had against Escalante-Sostre (who she paid only $3,500 and who demonstrably did work in Gutierrez's case), Lopez responded that she just "let it slide."

With this background, the Court cannot help but question the motives for the defamatory campaign against Escalante-Sostre. The Court finds it likely that, as suggested by Escalante-Sostre's uncontroverted expert witness, the Defendants defamed Escalante-Sostre as an attempt to create a criminal investigation into and prosecution of Escalante-Sostre to facilitate obtaining a U-Visa for Gutierrez as a victim of a "crime."[16]

This finding is bolstered by further testimony from Lopez. When asked why she posted the statements and why she began litigation against Escalante-Sostre, Lopez vacillated between various conflicting reasons. At one point, she stridently testified (before an attempt to backpedal on redirect with her counsel) that the reason for pursuing a lawsuit against Escalante-Sostre was to get her husband immigration relief via the U-Visa. Lopez also stated that the goals of the campaign were to get "justice" for other wronged clients, and to protect potential future clients from harm. Then again, Lopez would sometimes testify that all that she and Eloy wanted was their money back, and that they created the Facebook page and posted the defamatory statements because they assumed they wouldn't get their money back and needed another way to pressure Escalante-Sostre into a refund.

The latter two reasons have clear remedies. If Lopez was concerned about protecting others, she could report the conduct to the Texas Disciplinary Board or the Puerto Rico Supreme

---

[16] This effort appears to have been misguided, as it's unclear to the Court how Escalante-Sostre committing "fraud" or even "theft" would allow Gutierrez to obtain a U-Visa, as neither are "qualifying crimes" under 8 U.S.C. § 1101(a)(15)(U)(iii).

Court (as she did) and await resolution of those grievances. If Lopez only wanted her money back, she could have initiated a malpractice suit (which she later did) and similarly awaited the results. But the creation of a Facebook page whose title accused Escalante-Sostre of fraud, the publishing of numerous defamatory statements imputing criminal conduct to Escalante-Sostre, and the repeated attempts to label Escalante-Sostre a liar and a fraud to members of the community who might have sought Escalante-Sostre's legal services were steps that were beyond reasonable. These were measures which the law does not condone, and which amount to negligence.

The Court further finds that the statements made by Defendant Gutierrez and Intervenor Vaca were negligently made. Gutierrez is subject to the same motivations detailed above concerning his need of a U-Visa, and therefore the Court views his appearance on Univision accusing Escalante-Sostre of doing "nothing" in his case as both self-serving and unreasonable based on the circumstances. As to Intervenor Vaca, the Court similarly finds that urging others to baselessly sue Escalante-Sostre for non-existent "fraud" and further accusations of lack of licensure were negligently done—Escalante-Sostre has been licensed to practice law by the Supreme Court of Puerto Rico since 2004.[17]

(v)    *Defendants' appeal to the Texas Citizens' Participation Act is inapposite.*

In post-trial briefing but not in trial, Defendants raised defenses under the Texas Citizens' Participation Act ("**TCPA**"). Defendants argue that under the TCPA, they have a right to

---

[17] Although there was some discussion in this case of Escalante-Sostre's recent suspension from practice before the courts of the Western District of Texas due to an error in her admission, this had no impact on her ability to practice immigration law in San Antonio. As mentioned in the Court's oral ruling on the dischargeability proceedings, all that is necessary for an attorney to represent immigration clients in immigration court and before USCIS is to be in "good standing" of the bar of the highest court of any State, D.C., a U.S. possession, territory, or commonwealth. 8 C.F.R. §§ 1001.1(f); 1292.1(a)(1). Escalante-Sostre met those requirements, and was lawfully practicing.

"communicate relevant issues to the public" and that because their actions fall under the definition of "matters of public concern" under the TCPA, they cannot be held liable for their actions.

The TCPA does not apply in federal court. ***Klocke v. Watson***, 936 F.3d 240, 245 (5th Cir. 2019) ("Because the TCPA's burden-shifting framework imposes additional requirements beyond those found in Rules 12 and 56 [of the Federal Rules of Civil Procedure] and answers the same question as those rules, the state law cannot apply in federal court."). In Defendants' pretrial attempt to apply TCPA, this Court previously directed the Defendants to ***Klocke***,[18] but such direction did not seem to deter Defendants' redeployment of the TCPA arguments in post-trial briefing. If unclear then, it should be made clear now: Defendants cannot raise defenses under the TCPA in federal court.[19]

    *(vi)*    *Defendants' and Intervenor Vaca's further defenses of truth and of belief fall short.*

Defendants obliquely argue that they should not be held liable for defamation because the defamatory statements were substantially true. Defendants also argue, without authority, that they honestly believed the statements to be true, and therefore should not be held liable. Both arguments fail.

---

[18] *Order on Defendants' Motion to Dissolve Temporary Injunctions Pursuant to Federal Rules of Civil Procedure Rules 52 and 65 (ECF No. 30)* (ECF No. 47) at *6 n.3.

[19] Even if this suit were being heard in state court, the TCPA would not apply at this stage of the litigation. The TCPA provides defendants a way to dismiss an action that is "based on or is in response to a party's exercise of the right of free speech, right to petition, or right of association…" TEX. CIV. PRAC. & REM. CODE § 27.003. The TCPA provides no other remedies beyond the right to file a motion to dismiss, a motion which must be filed "not later than the 60th day after the date of service of the legal action." Not only was no such motion filed in this case, but the legal action was also filed over five years ago at the time of the entry of this Opinion. Defendants also grasp at the definitions set forth in the TCPA, arguing for their applicability in this adversary proceeding. The definitions section of the TCPA, however, only applies for the Act itself (Chapter 27 of the TEX. CIV. PRAC. & REM. CODE), and does not provide this Court with substantive definitions of "public concern" when confronted with a defamation action. To the contrary, the Act itself states that "[t]his chapter does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case, or common law or rule provisions." TEX. CIV. PRAC. & REM. CODE § 27.011(a). This Court, when faced with a defamation action that has been fully tried, must apply the jurisprudence as set forth by the Supreme Court, the 5th Circuit, and the Texas Supreme Court.

Generally, defamation plaintiffs must prove that a statement was defamatory but need not prove its falsity; the defendant bears the burden of proving truth as an affirmative defense. *See* Tex. Civ. Prac. & Rem. Code § 73.005(a) ("The truth of the statement…is a defense to the action."); ***Neely v. Wilson***, 418 S.W.3d 52, 56 (Tex. 2013) ("Truth is a defense to all defamation suits."). This Court has already rendered a take-nothing judgment in Eloy Lopez-Gutierrez's dischargeability case.[20] In that adversary proceeding, the Court found that his claims against Escalante-Sostre for "fraud while acting in a fiduciary capacity" under 11 U.S.C. § 523(a)(4) were not proven and went even further to hold that there was no evidence Escalante-Sostre even owed him a debt. Moreover, in the defamation case, Defendants failed to show that Escalante-Sostre had "stolen money" from them, or that she had committed fraud beyond what was alleged in the dischargeability action. Therefore, Defendants' defense of substantial truth fails.

Gutierrez's statements are demonstrably false. In the Univision report, Gutierrez claimed Escalante-Sostre had done "nothing" in his case. That claim is refuted not only by Escalante-Sostre's testimony, but also by Plaintiff's Exhibits 14, 15, 16, 17, 18, 19, 20, 21, 22, and 23, all exhibiting legal services performed by Escalante-Sostre.

Intervenor Vaca's statement was also false. As stated in Vaca's dischargeability proceeding, Vaca failed to prove that Escalante-Sostre committed any fraud in his case. Further, this Court held that Vaca failed to show he was owed a debt. As to the attack on Escalante-Sostre's licensure, as mentioned above, Escalante-Sostre has been licensed to practice law since 2004 and was lawfully practicing at all times before Vaca's statement.

---

[20] Adv. Proc. No. 23-05072-mmp.

Defendants also repeatedly allege that when they published the defamatory statements, they "believed them to be true," and imply that this belief should negate liability. Lopez also specifically defends her statements that accuse Escalante-Sostre of "fraud" and "theft" by claiming that because she did not know the legal definition of fraud and theft, she cannot be held liable for the accusations. These arguments miss the mark. Ignorance of the law is not a defense, even if it might be a mitigating circumstance in a criminal matter.

A statement is defamatory only if it is reasonably capable of a defamatory meaning from the perspective of an ordinary reader in light of the surrounding circumstances. ***Hancock***, 400 S.W.3d at 66. Defendants' subjective opinion of their own statements is of little importance compared to how those statements are interpreted by "an ordinary reader." Whether or not Lopez herself thought she was accusing Escalante-Sostre of criminal fraud or civil fraud, or whether she did not appreciate the differences between a breach of contract and theft has no bearing on whether the statements were defamatory, nor on her liability for those statements.

Furthermore, statements that an attorney "is a fraud" or is "stealing money" carry weight even without their legal definition. Both imply that Escalante-Sostre acted dishonestly and lied to her clients, neither of which were true in this case. Defendants' repeated statements that Escalante-Sostre "did nothing" in their case do not require specialized legal knowledge to parse nor to understand their falsity—Escalante-Sostre filed many pleadings and documents in Gutierrez's and Vaca's immigration cases and provided legal services under their engagement agreements. Defendants' and Intervenor Vaca's defamatory statements are false now and were false when they were made.

*(vii)    Damages*

Plaintiffs seek damages as a result of Defendants' and Intervenor Vaca's defamation.

29

There are three types of damages at issue in a defamation per se proceeding: (1) nominal damages; (2) actual or compensatory damages; and (3) exemplary damages. *Hancock*, 400 S.W.3d at 65. Nominal damages are only permitted for, and are presumed in, cases where defamation per se is proven. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). Actual damages compensate a plaintiff for the injury she incurred and include general damages (non-economic damages, i.e. loss of reputation or mental anguish) and special damages (economic damages such as for lost income). Exemplary damages are damages "awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages are neither economic nor noneconomic damages." TEX. CIV. PRAC. & REM. CODE § 41.001.

> *(a) The Court will award Escalante-Sostre actual damages from Lopez, Gutierrez, and Vaca.*

In defamation per se cases, Texas law permits an award of nominal damages without proof of actual injury because mental anguish and loss of reputation are presumed. *Brady v. Klentzman*, 515 S.W.3d 878, 886 (Tex. 2017) (citing *In re Lipsky*, 460 S.W.3d at 596). But the First Amendment requires competent evidence to support an award of actual or compensatory damages when the speech is public or the level of fault is less than actual malice. *Hancock*, 400 S.W.3d at 65; *see also* *Salinas v. Salinas*, 365 S.W.3d 318, 320 (Tex. 2012) ("However, even if some mental anguish can be presumed in cases of defamation *per se*, and if we assume the Telemundo statement was defamatory *per se*, the law does not presume any particular amount of damages beyond nominal damages."). If a plaintiff seeks actual damages or special damages beyond nominal damages, the plaintiff must present evidence of the existence and amount of these damages. *Brady*, 515 S.W.3d at 886. Courts are cautioned to only award compensatory damages in defamation cases which compensate for "*actual* injuries," and such damages cannot be used as

30

a "disguised disapproval of the defendant." *Burbage*, 447 S.W.3d at 259 (quoting *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002)) (emphasis in original).

That said, evidence of loss of reputation need not be presented with mathematical precision. In Texas, a defamation factfinder "must be given some latitude because these general damages are, by their nature, incapable of precise mathematical measure." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 159-60 (Tex. 2014). Loss of reputation must be "more than theoretical," but a defamation plaintiff seeking actual damages may succeed if there is "evidence that people believed the statements and the plaintiff's reputation was actually affected." *Burbage*, 447 S.W.3d at 261–62. In *Brady*, the court found that because "some people thought less of Wade [the plaintiff] after the article was published and that his employer asked him to quit his job shortly after reading the article is evidence of damages for loss of reputation." *Brady*, 515 S.W.3d at 887–88.

Here, the Court finds that there was sufficient evidence of reputational harm done by Lopez's defamatory statements. Not only was there extensive testimony by the Plaintiffs as to the effect the Defendants' defamatory campaign had on the Law Office and legal practice of Escalante-Sostre (both of which ceased to operate), the mere existence of the over twenty unsuccessful dischargeability claims in Escalante-Sostre's bankruptcy case are evidence that a notable portion of her former clients began to question the services they received after the Defendants defamed Escalante-Sostre. In those dischargeability proceedings, the vast majority of the former clients repeatedly mentioned that they only got the idea to sue Escalante-Sostre after seeing either the Facebook Page or one of the Univision reports. Not only did others appear to believe the statements of "fraud" and "theft" propounded by the Defendants, but they also acted on that belief by filing

31

dischargeability actions and police reports that were ultimately unsuccessful. Therefore, the Court will award $150,700.00 in actual damages to compensate Escalante-Sostre for the damage done to her reputation by Lopez.

The Court arrived at this number by adding together the Law Office's net "ordinary business income" (gross income minus deductions) for 2018 and 2019, based on the Law Office's federal income tax returns. Pl.'s Exs. 53 and 54. The Court recognizes that over time the damage done by a defamatory action will dissipate such that while actual damages might continue to accrue over 5 to 10 years, but the immediate impact of such actions is felt nearest in time to those actions. The Court also has considered the potentially contributory effects of the COVID-19 shutdowns during 2020 and 2021. This results in a sum of $151,700, a sum which the Court considers to approximate the relative value of Escalante-Sostre's reputation at the time of the defamation. Because the defamation almost single-handedly put the Law Office out of business and ended Escalante-Sostre's law practice, it also made the value of Escalante-Sostre's professional reputation essentially $0 (if not a negative). The Court therefore considers the actual damages for loss of reputation to Escalante-Sostre to be $151,700, calculated by awarding: $150,700 against Lopez, $500 against Gutierrez, $500 against Vaca.

In considering Gutierrez's and Vaca's statements, the Court finds that while nearly all of the damages were caused by Lopez and her defamatory campaign, Gutierrez and Vaca also contributed to Escalante-Sostre's loss of reputation through their statements in ways which exceed a mere nominal award of damages. Gutierrez's statements to Univision that Escalante-Sostre did "nothing" and Vaca's encouragement for others to sue likely emboldened others to join the ultimately meritless lawsuit and further tarnished Escalante-Sostre's reputation by adding to the

chorus of unfounded complaints. Therefore, the Court separately awards Escalante-Sostre $500 in actual damages for defamation perpetrated by Gutierrez, and $500 in actual damages for defamation perpetrated by Vaca.

To the extent Escalante-Sostre seeks actual damages for mental anguish, there must be evidence of the existence of mental anguish and evidence to justify the amount awarded. ***Bentley,*** 94 S.W.3d at 606. Mental anguish is only compensable on a showing of a "substantial disruption in…daily routine" or "a high degree of mental pain and distress." ***Parkway Co. v. Woodruff***, 901 S.W.2d 434, 444 (Tex. 1995). That showing must also include evidence of the "nature, duration, and severity" of the mental anguish. ***Serv. Corp. Int'l v. Guerra***, 348 S.W.3d 221, 231 (Tex. 2011).

In ***Bentley***, the court awarded damages for mental anguish to a judge falsely accused of corruption, because he experienced embarrassment in the community where he spent all of his life, was distressed and depressed, lost sleep, suffered a major change in demeanor, and would never be the same. 94 S.W.3d at 576, 606–07. The court in ***Bentley*** also considered that the judge's family was disrupted, his children bothered by peers discussing the allegations, and testimony that wherever he went, people would stop and tell the judge that they heard he was corrupt. ***Id.*** at 606.

In contrast, the court in ***Hancock*** did not award damages for mental anguish because the plaintiff "did not elaborate on the impact of anxiety or depression on his life, nor did other witnesses corroborate an outward manifestation of the mental anguish Variyam [the plaintiff] allegedly experienced." ***Hancock***, 400 S.W.3d at 70. There was also testimony that Variyam continued "interacting with the recipients of the [defamatory] letter and he testified that the letter did not affect his care of patients." ***Id.***

33

Here, the Court finds that there was sufficient testimony for an award of actual damages for mental anguish. Escalante-Sostre and her husband Sostre-Odio testified to how the defamation affected Escalante-Sostre's daily habits. Escalante-Sostre herself testified about her fear to return to work and her need for a psychiatrist and medication as a result of the defamation. Sostre-Odio testified that Escalante-Sostre essentially became a different person, from a confident immigration attorney to a withdrawn and shy recluse. There was even testimony that during the fallout of the defamation and ensuing litigation, Escalante-Sostre and Sostre-Odio were in marital distress due to the stress the case had on the household. The Court therefore finds Escalante-Sostre made a sufficient showing of mental anguish, and therefore will award $20,000 in damages for mental anguish against Lopez, $200 against Gutierrez, and $200 against Vaca.

*(b) The Court will not award exemplary damages.*

Exemplary damages (also known as punitive damages) are available to plaintiffs who prove actual damages and who seek damages which aim to punish the defendant. ***Fed. Express Corp. v. Dutschmann***, 846 S.W.2d 282, 284 (Tex. 1993) ("Recovery of punitive damages requires a finding of an independent tort with accompanying actual damages."); TEX. CIV. PRAC. & REM. CODE §§ 41.001(5), 41.004(a).

In ***Gertz***, the Supreme Court held that the First Amendment precludes an award of punitive damages without a showing of actual malice, even for private plaintiffs. ***Gertz***, 418 U.S. at 349–50 (holding that under any state-created defamation standard lower than actual malice, a plaintiff may recover "only such damages as are sufficient to compensate him for actual injury."). "Actual malice" is a term of art which focuses on the defamation defendant's own attitude toward the defamatory statement, requiring a showing that the statement was made "with knowledge of its

34

falsity or with reckless disregard for the truth." *Id.* at 342. "Reckless disregard" is yet another term of art, which requires not merely a showing of lack of care for the truth or lack of investigation, but a higher showing that "the defendant in fact entertained serious doubts as to the truth of his publication." *Einhorn*, 823 S.W.2d at 413–14. Understandable misinterpretations of ambiguous facts do not show actual malice, but "inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; purposeful avoidance of the truth is." *Bentley*, 94 S.W.3d at 597.

Thus in Texas, defamation plaintiffs who seek exemplary damages must prove both the "traditional malice" required to obtain exemplary damages for any tort,[21] and "actual malice" to satisfy the First Amendment.

Here, the Court finds that there is insufficient evidence of state law "malice" for a finding of exemplary damages. There is insufficient evidence that Lopez had a "specific intent to cause substantial injury or harm" to Escalante-Sostre. Lopez either knew that the statements she was making was false in an attempt to secure a U-Visa and a refund from Escalante-Sostre, or purposefully avoided knowing its truth. Although the Court agrees with the Plaintiffs that attaining a U-Visa and refund was the motive for Lopez's actions, the Court cannot agree that Lopez acted with a specific intent to *harm* Escalante-Sostre. Therefore, the Court shall not award exemplary damages.

---

[21] *See* TEX. CIV. PRAC. & REM. CODE § 41.003 (conditioning exemplary damages on proof by "clear and convincing evidence" of fraud, malice, or gross negligence); *see also id.* § 41.001(7) (defining "malice" as "a specific intent by the defendant to cause substantial injury or harm to the claimant").

## B. Business Disparagement

Plaintiffs also raise claims of business disparagement against Defendants. Business disparagement in Texas is a similar tort to defamation, except that the falsehoods concern "the condition or quality of a business's products or services" and the falsehoods "are intended to, and do in fact, cause financial harm." *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.,* 603 S.W.3d 409, 417 (Tex. 2020). To succeed, a plaintiff must show that a defendant (i) made a statement, (ii) concerning a product or service of another, (iii) that is false, (iv) published with malice, (v) with the intent that the publication cause pecuniary loss or the reasonable recognition that it will, and (vi) pecuniary loss does in fact result. *Id.* Although there is overlap between the two claims, defamation is concerned with a protection of reputation, while business disparagement "seeks to protect economic interests against pecuniary loss." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex. 2014). Because of this, in a claim of business disparagement, proof of special damages is seen as a "fundamental element of the tort." *Id.* Special damages, synonymous with economic damages, represent specific economic damages that must be proven. *In re Lipsky*, 460 S.W.3d at 593.

Here, plaintiffs failed to specifically prove economic losses in a way that justifies an award of special damages. As evidence of damages, Escalante-Sostre has merely gestured the Court toward the Law Office's yearly tax returns. Pl.'s Exs. 52–57. The tax returns show a significant drop in revenue from tax year 2019 to the subsequent tax years. But this coupled with Escalante-Sostre's testimony that the disparagement caused the loss of business is insufficient evidence of special damages. While the Court acknowledges that some of the lost revenue could have come from the Defendants' defamatory campaign, the Court also acknowledges that many small businesses suffered as a result of the COVID-19 pandemic and its accompanying lockdowns which

36

began in March 2020. This is even more undercut by testimony from Escalante-Sostre and a former employee, Jose Kadar, that in 2019, Escalante-Sostre had to let go some of her staff because they could not afford to keep them on the payroll. It is therefore difficult to determine from the evidence provided what business was lost due to the Defendants' statements and what business was lost because of other factors.

Moreover, the Court must avoid double-dipping on damages where all revenue from Law Office flows to Escalante-Sostre. Ultimately here, the Court used business tax returns to gauge damages done to Escalante-Sostre *personally*. When a solo practicing lawyer's primary source of income is always her firm's income, separating the two for damages purposes requires a keen eye to avoid allowing a plaintiff to double-dip in its request for damages.

The plaintiffs have provided insufficient evidence to grant special damages, and therefore the Court will not award damages on their claim of business disparagement.

### C. Civil Conspiracy

Plaintiffs also raise claims of civil conspiracy against the Defendants, as well as against a number of the Intervenors. An actionable civil conspiracy occurs when a group of two or more persons seek to "accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Cotton v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 701 (Tex. App.—Fort Worth 2006, pet. denied) (overruled on other grounds). A successful civil conspiracy plaintiff proves that the group had a "meeting of minds on the object or course of action," and that they undertook "one or more unlawful, overt acts" which resulted in proximate damages to the plaintiff. *Id.* A civil conspiracy claim may be proved by circumstantial evidence and reasonable inferences from the parties' actions. *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 581 (Tex. 1963).

The Court finds that the plaintiffs failed to establish through clear and specific evidence that the Defendants and the Intervenors agreed on the objective to defame Escalante-Sostre. No meeting of the minds was shown, although it appeared the Intervenors where "piling on." Inherent to the "meeting of the minds" element of conspiracy is an assumption that the conspirators understood that their shared purpose was unlawful or that the means to accomplish a shared lawful purpose was unlawful. The Court can find no evidence here that the Intervenors agreed with the Defendants to unlawfully defame Escalante-Sostre to jointly take her down. Instead, it appears to the Court that while the Defendants may have intended to defame Escalante-Sostre to gain immigration benefits and get their money back, they persuaded the Intervenors to join the lawsuit by telling them Escalante-Sostre had defrauded them and encouraging them to "assert their rights."

### D. Permanent Injunction

Finally, Plaintiffs seek a permanent injunction against the Defendants. Plaintiffs request an injunction that prohibits the Defendants from:

i. Bullying and harassing Plaintiffs and their agents, associates, contacts, friends and third parties by showing up at their children's events and causing disruption to Plaintiffs and their places of business.
ii. Intimidating, bullying and harassing Plaintiffs' friends, associates and third parties related to them in order to interfere with Plaintiffs and their children's ability to perform their jobs, hobbies and extracurricular activities.
iii. Disrupting Mrs. Escalante-Sostre's law office in order to try to intimidate and discredit Plaintiffs.
iv. Bullying and harassing Plaintiffs, its associates, employees, contractors, and/or third parties.
v. Bullying and harassing Plaintiffs, its agents, employees, contractors and/or third parties with the purpose of interfering with the progress and work of Mrs. Escalante-Sostre's office or hobbies or personal activities or that of her minor children.

Plaintiffs also seek an order requiring the removal of any prior defamatory statements made against Plaintiffs or the Law Office and requiring that the Lopezes "report to any media source

38

Defendants previously dealt with that the statements were determined to be false and defamatory by the Court." The Court finds that the request for a permanent injunction should be granted in part and denied in part.

Injunctions on future speech, also known as "prior restraints," are heavily disfavored. Both the Texas Supreme Court and United States Supreme Court have long held that prior restraints are presumptively unconstitutional and represent a gross infringement on free speech rights under both the U.S. and Texas Constitutions. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) ("The thread running through all these cases is that prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights."); *Davenport v. Garcia*, 834 S.W.2d 4, 9 (Tex. 1992) ("The presumption in all cases under section eight [of article I of the Texas Constitution] is that pre-speech sanctions or 'prior restraints' are unconstitutional."). The party who seeks prior restraints "carries a heavy burden of showing justification for the imposition of such a restraint." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

*Kinney v. Barnes* is the leading Texas Supreme Court case regarding actions for a permanent injunction enjoining speech deemed defamatory. 443 S.W.3d 87 (Tex. 2014). In *Kinney*, a legal recruiter sued a former employer for defamation. Kinney, however, sought no damages and only sought a permanent injunction enjoining future publication of the speech held to be defamatory. Kinney sought an order requiring Barnes to (i) remove the allegedly defamatory statements from Barnes' websites, (ii) contact third-party republishers of the statements to have them remove the statements, and (iii) conspicuously post a copy of the permanent injunction on Barnes's website for six months. Kinney further sought an order permanently enjoining Barnes

from making statements similar to the speech held to be defamatory. The Texas Supreme Court addressed the constitutionality of the relief sought, assuming that the speech was defamatory.

The court first held that an order requiring Barnes to remove the defamatory statements from his website and request that third-party republishers do the same was constitutionally permissible. The court considered such an order as "requir[ing] the erasure of past speech that has already been found to be unprotected in the context in which it was made," that it was "accurately characterized as a remedy for one's abuse of the liberty to speak," and was therefore "not a prior restraint." *Id.* at 93.

The court also acknowledged the limited circumstances in which prior restraints are constitutionally permissible. The court (and Escalante-Sostre in this case) cited to ***Ex parte Tucker***, 220 S.W. 75 (Tex. 1920), a case in which the Texas Supreme Court suggested that prior restraints may be permissible to prevent interference of the "exercise of natural and contractual rights" via "[v]erbal or written threats." But in ***Kinney***, the court cabined this exception by noting that it is permissible "only when essential to the avoidance of an impending danger" and "only when it is the least restrictive means of preventing that harm." ***Kinney***, 443 S.W.3d at 95 (citing ***Davenport***, 834 S.W.2d at 9, and ***Ex parte Tucci***, 859 S.W.2d 1, 6 (Tex. 1993)).

But broadly, ***Kinney*** holds that while an injunction may order removal of speech previously held to be defamatory, the proper remedy for future defamation is damages from a new defamation action. The ***Kinney*** court was especially concerned about the possibility of an overbroad injunction, as "[g]iven the inherently contextual nature of defamatory speech, even the most narrowly crafted of injunctions risks enjoining protected speech because the same statement made at a different time and in a different context may no longer be actionable. Untrue statements may

40

later become true; unprivileged statements may later become privileged." *Kinney*, 443 S.W.3d at 98. Moreover, even where a defamation plaintiff is concerned that damages will not provide an effective remedy against a defendant (as when the defendant is judgment-proof), such a concern is insufficient to justify a prior restraint. *Id.*

Here, most of Escalante-Sostre's requested injunction does not meet the very limited exception to the rule against prior restraints, and therefore must largely be denied.

As in *Kinney*, the Court will include in its judgment an injunction requiring the removal of statements adjudicated defamatory from any places they were posted by the Defendants. The injunction will also require, similar to *Kinney*, that the Defendants request from any third party republisher that the defamatory statements already made be removed from publication because a court found them to be defamatory.

All other requested injunctive relief must be denied. The Court finds that the requested language for the injunction is overbroad and is not sufficiently justified by an imminent danger to the plaintiffs. Although this Court does not condone "bullying," "harassment," or "disrupting," the injunction, as crafted, will chill protected speech. Moreover, the plaintiffs have sufficient remedies available to them should the Defendants engage in subsequent defamatory behavior. Defendants' and Intervenors' continued defamation could be considered evidence of malice necessary to impose exemplary damages.

## V.    CONCLUSION

In conclusion, the Court finds that Defendants and Intervenor Vaca defamed Escalante-Sostre and that such defamation was defamation per se. The Court awards Escalante-Sostre actual damages from Defendant Gutierrez and Intervenor Vaca in the amount of $700 each ($500 in loss

41

of reputation, and $200 in mental anguish), and awards actual damages against Defendant Lopez in the amount of $150,700 for loss of reputation and $20,000 for mental anguish. The Court denies Plaintiffs' requests for exemplary damages, the claim of business disparagement, and the claim of civil conspiracy. Finally, in its Judgment pursuant to this *Opinion*, the Court will issue an injunction requiring the removal from all platforms of all statements deemed defamatory but will not enjoin future speech.

# # #